UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

JOHN IRETON-HEWITT,

Plaintiff,

vs                                                 6:05-CV-450

CHAMPION HOME BUILDERS CO.,

Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:                                      OF COUNSEL:

GLEASON DUNN WALSH & O'SHEA                        RONALD G. DUNN, ESQ.
Attorneys for Plaintiff
40 Beaver Street
Albany, New York 12207

SCHRODER, JOSEPH & ASSOCIATES                     LINDA H. JOSEPH, ESQ.
Attorney for Defendant                            HEATHER GIAMBRA, ESQ.
766 Ellicott Street
Buffalo, New York 14203

DAVID N. HURD
United States District Judge

## MEMORANDUM-DECISION and ORDER

## I. INTRODUCTION

Plaintiff John Ireton-Hewitt ("plaintiff" or "Ireton-Hewitt") commenced this action

against defendant Champion Home Builders Co. ("defendant" or "Champion"), alleging age

discrimination in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C.

§§ 621-634, and New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law §§ 290-

301, for conduct related to the termination of his employment.  Plaintiff also brings state

claims for failure to pay wages and benefits pursuant to Article 6 of New York Labor Law §§ 190-199, and breach of contract.

Defendant moves for summary judgment on all claims pursuant to Fed. R. Civ. P. 56.  Plaintiff opposes.  Oral argument was heard in Utica, New York, on November 6, 2006. Decision was reserved.

## II. <u>FACTS</u>

The following facts are viewed in a light most favorable to the nonmoving party, Ireton-Hewitt.

In 1993, Ireton-Hewitt began employment with Champion, a publicly-owned company that manufactures pre-fabricated modular homes at plants throughout the United States.  Champion employed him as General Manager of it's facility in Sangerfield, New York, which operated under the name Titan Homes.

When Champion hired Ireton-Hewitt, they provided him with an Employee Handbook.  The Employee Handbook specifically stated, "This Handbook is not a contract for a specified period of time between the Company and its employees. Nor is [it] a contract for specific employment benefits."  (Def. Statement of Facts ¶ 112 ("SOF").)  Plaintiff signed the Employee Handbook, acknowledging its contents and receipt thereof.

As General Manager, Ireton-Hewitt oversaw and approved the facility's accounting reporting system.  John Susenburger ("Susenburger"), Titan Homes' Comptroller, worked under plaintiff and determined which sales would be recognized as revenue in a particular month.  In turn, plaintiff reviewed Susenburger's monthly financial statements to ensure their accuracy and compliance with Champion's accounting rules and principles.

As a publicly-held company, Champion must comply with, inter alia, Securities and Exchange Commission ("SEC") accounting mandates.[1]  To comply with federal requirements, Champion established a set of criteria that must be satisfied before a sale could be recognized as revenue.  Champion's Sales Cut-Off and Revenue Recognition Policy, dated September 1, 2000, stated, "revenue can be recognized from the sale of a home upon the transfer of title when generally the home has been shipped and collectability of the invoice price is reasonably assured . . . [However,] homes stored at the written request of the buyer with a good business purpose can qualify as a sale."  (Joseph Aff. Ex. K.)  Under the policy, revenue was recognized when a home was shipped or a sold home which was not shipped was accompanied by a "Bill and Hold" form.

Champion considered a home shipped once the transporter assumed control over the home.  Commonly, this occurred when the transporter actually removed the home from Titan Homes' lot en route to the buyer's location.  In some circumstances defendant considered a home shipped when the transporter signed for the home but removed it at a later, more convenient time.

When a home was sold but not shipped, Champion only recognized the sale as revenue when a completed Bill and Hold form accompanied the sold home.  Champion lacked a uniform Bill and Hold form or procedure, therefore, each plant had personalized Bill and Hold forms.  A Bill and Hold form constituted a written request by the customer to have their home stored at the manufacturing plant.  Customers took this path when physically delivery was not possible.

---

[1] Champion must comply with the SEC's Staff Accounting Bulletin Number 101 (SAB 101), which delineates revenue recognition requirements for goods remaining on plant lots that have not been shipped.

To comply with Champion's revenue recognition mandates, at least five plants used shippers lots. Of these five plants, three plants, Berthoud, Colorado ("Berthoud plant"); Weiser, Idaho ("Weiser plant"); and Ephrata, Pennsylvania ("Ephrata plant") had shippers lots established by formalized lease agreements. The remaining two plants, Chandler, Arizona ("Chandler plant") and Sandford, North Carolina ("Sandford plant"), had shippers lots created by informal agreements, not leases. Furthermore, the Berthoud, Sanford, and Weiser plants only recognized revenue for homes on the shippers lots which had completed Bill and Hold forms. Conversely, the Ephrata and Chandler plants recognized revenue for homes on the shippers lots that did not have completed Bill and Hold forms. Thus, their transporters would "sign" for sold homes which would remain on the shippers lot. Each would treat these homes, which did not have completed Bill and Hold forms, as "shipped" and recognize them as revenue.

On December 1, 2003, Champion implemented a new Bill and Hold form which standardized the Bill and Hold procedure to ensure all it's plants complied with federal regulations.[2] To recognize revenue for homes sold but not shipped, defendant mandated that the new Bill and Hold form be completed and signed. The new Bill and Hold form served the same purpose as the old form--it confirmed that the buyer would be billed for the home, which would remain on the facility's lot until delivery was possible. However, the new Bill and Hold form shifted the assumption of risk of loss onto the buyer from the holding facility. Dissatisfied with this change, Titan Homes' customers refused to sign the new form.

---

[2] Particularly, Champion's new revenue recognition policy ensured that its plants complied with the Sarbanes-Oxley Act of 2002 (SOX), which delineated new revenue recognition requirements.

On December 13, 2003, Jim Dunn ("Dunn"), Champion's Eastern Regional President, relayed this problem to Corporate Comptroller, Rick Hevelhorst ("Hevelhorst").  In response, Hevelhorst reiterated that Champion's accounting practices must be followed, which included the new Bill and Hold form.  Dunn immediately responded, "OK, Well I know what to do."  (Hevelhorst Dep. at 80 ¶ 13-15; Dunn Dep. at 49 ¶ 16-23.)

Shortly thereafter, Dunn instructed Sam Hollister, the Ephrata plant's General Manager, to fax a copy of it's lease agreement to Titan Homes.[3]  After Titan Homes received the lease, Dunn, who was plaintiff's superior, instructed him to duplicate it and enter a lease with Signature Transportation, LLC, Titan's Homes' transporter.

On December 24, 2003, Hevelhorst sent an e-mail to all of Champion's comptrollers and general managers, which included Susenburger and Ireton-Hewitt, reiterating that all homes recorded as a sale but not shipped must have completed new Bill and Hold forms.  Further, Hevelhorst disclosed that Bill and Hold transactions were an SEC "hot button" and that Champion's auditor would be auditing these transactions at year end, which may require the production of Bill and Hold forms and invoices.

On approximately December 30, 2003, Ireton-Hewitt executed a lease with Signature Transportation.  The lease designated a portion of Titan Homes' storage lot as a shippers lot, whereby Signature Transportation would sign for homes that would remain in the shippers lot, physically unshipped.  Titan Homes categorized these homes as "shipped" and recognized them as revenue in the absence of a Bill and Hold form.  As a result of its

---

[3]  Dunn developed and implemented the Ephrata plant's lease 15 years earlier when he was it's General Manager.  The lease created a "shippers lot" on its plant yard in which its transporter would "sign" for sold homes which would remain on the shippers lot.  The Ephrata plant treated these homes, which did not have completed Bill and Hold forms, as "shipped" and recognized them as revenue.

lease, Titan Homes used its shippers lot in the same manner as the Ephrata and Chandler plants did, to recognize revenue, without a new Bill and Hold form.

On January 30, 2004, Champion's corporate comptroller, Jon Korpalski ("Korpalski") sent an e-mail to the plant comptrollers, including Susenburger, informing them that it's auditor had initiated an audit of the Bill and Hold transactions.  Korpalski further articulated that the auditor requested copies of executed Bill and Hold forms for homes included in revenue for the month of December 2003, that were not shipped as of the sales cut-off date.

Shortly after receiving the e-mail Susenburger responded with the requested list of homes.  Almost immediately, Susenburger realized he submitted an erroneous list of homes recognized as revenue because it included homes retained pursuant to the shippers lease which did not have completed Bill and Hold forms.  On February 4, 2004, Susenburger called to report and explain the error, which resulted in a conversation between Susenburger, Korpalski, and Hevelhorst.  Susenburger explained he did not have Bill and Hold forms for some of the homes appearing on the list of homes recognized as revenue for December 2003, because the list accidentally included homes signed out by Signature Transportation and retained on the shippers lot pursuant to their lease.  As a result of Susenburger's explanation, Hevelhorst became aware of Titan Homes' use of its lease.

Hours later, Hevelhorst informed Phyllis Knight ("Knight"), Champion's CFO; John Collins, Champion's General Counsel; Stefan Michalack, head of Champion's internal audit committee; and Al Koch ("Koch"), Champion's CEO and President; of the information divulged by Susenburger.  Knight asked Hevelhorst to assess how prevalent shippers lots were among Champion plants.  After an inquiry, Hevelhorst concluded shippers lots were not prevalent, but that Titan Homes, the Ephrata, and Chandler plants used shippers lots to

recognize revenue for homes not physically shipped which lacked completed Bill and Hold

forms.

In early February, the following conversation occurred, pursuant to Dunn's

recollection:

Al Koch:          "Our management sure is old"

Jim Dunn:        "Thank god or I would be dead"

B.J. Williams:   "Hell, Jack Hewitt is 67 years old, right Jim?"

Jim Dunn:        "That's correct but we have a plan in place that will work when Jack
                 retires without the plant missing a beat"

On February 12, 2004, a week after this conversation, Koch terminated Dunn, age

59; Susenburger, age 53; and Ireton-Hewitt, age 66.  According to Koch, he premised the

terminations on what he viewed as a "deliberate attempt to circumvent the new bill and hold

policies to recognize revenue."  (Def. SOF ¶ 72.)  In light of his interpretation of the lease and

SEC mandates, Koch reasoned that Champion's audit committee and/or the SEC may view

the lease as a "patently fraudulent transaction."  Id.  Therefore, Koch concluded Titan

Homes' lease contravened business ethics, honesty, and Champion's policies, and could

subject defendant to civil and criminal liability.  Id.  Koch also believed plaintiff's actions

demonstrated a propensity to subvert defendant's policies and SEC mandates, therefore he

concluded Champion could not retain him as an employee.  Id.

However, Koch did not terminate the Chandler and Ephrata plants' respective

comptrollers Dick Bortz and Doug Auka, both 63 years of age.  Additionally, Koch did not

terminate the Chandler plant's General Manager Paul Jarvis, age 51, and the Ephrata plant's

General Manager.  Koch claims he did not terminate the employees at these plants because

of a diametric difference--the Ephrata and Chandler plants had long-standing arrangements (the Ephrata plant with a lease, and the Chandler plant without a lease), whereas Titan Homes implemented its lease to circumvent the new accounting policy.

After the terminations, Champion adhered to the Succession Plan Ireton-Hewitt constructed years before his unexpected dismissal.  Plaintiff's Succession Plan detailed which individuals would take what positions, if and when the position became vacant.  As a result, John Copeletti succeeded Ireton-Hewitt.

Also, Champion did not pay Ireton-Hewitt's accrued but unused vacation pay, severance pay, and bonus.  The vacation provision of the Employee Handbook states, "should the employee terminate voluntarily or involuntarily, the employee will relinquish any unused vacation pay or any portion thereof (in certain states applicable state laws governing payment of vacation may apply)."  (Def. SOF ¶ 104.)  Furthermore, the Severance Policy states, "when a salaried employee is terminated, involuntarily, and not for cause he/she will receive severance pay".  Id. ¶ 108.  Ireton-Hewitt, a salaried employee, understood that an employee terminated for cause would not be eligible for severance pay under the Severance Policy.  (Ireton-Hewitt Dep. at 125 ¶ 5-10.)

Champion's 2003 Bonus Plan had four components: (1) Earnings Before Income Tax and Amortization; (2) Cash Management; (3) Customer Service Index; (4) Achieving a certain level of profit improvement.  The Employee Handbook stated, "[a]ny violation of Company policies or directions, or termination of employment, may result in loss of all or a portion of the bonus."  (Def. SOF ¶ 98.)  Ireton-Hewitt had knowledge of this policy and also understood that to be eligible for the bonus he must  hold the position identified at fiscal year end 2003 (January 3, 2004), and be on the active payroll when the bonuses were paid.

Defendant paid the bonuses for the fourth quarter of 2003 on February 27, 2004--

approximately two weeks after Ireton-Hewitt's termination.

Champion's summary judgment motion will be analyzed behind these set of facts.

## III.  DISCUSSION

### A.  Summary Judgment Standard

Summary judgment must be granted when the pleadings, depositions, answers to

interrogatories, admissions and affidavits show that there is no genuine issue as to any

material fact, and that the moving party is entitled to summary judgment as a matter of law.

Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S. Ct. 2505,

2509 (1986).  An issue is genuine "if the evidence is such that a reasonable jury could return

a verdict for the nonmoving party."  Anderson, 477 U.S. at 248, 106 S. Ct. at 2510.

Facts, inferences therefrom, and ambiguities must be viewed in a light most

favorable to the nonmovant.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S.

574, 586, 106 S. Ct. 1348, 1356 (1986); Project Release v. Prevost, 722 F.2d 960, 968 (2d

Cir. 1983).  Once the moving party has met the initial burden of demonstrating the absence

of a genuine issue of material fact, the nonmoving party "must set forth specific facts

showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56; Celotex Corp. v. Catrett,

477 U.S. 317, 323, 106 S. Ct. 2548, 2552-53 (1986); Matsushita Elec. Indus. Co., 475 U.S.

at 586, 106 S. Ct at 1356.  At that point the nonmoving party "must do more than simply

show that there is some metaphysical doubt as to the material facts."  Matsushita Elec.

Indus. Co., 475 U.S. at 586, 106 S. Ct. at 1356.  To withstand a summary judgment motion,

sufficient evidence must exist upon which a reasonable jury could return a verdict for the

nonmovant.  Anderson, 477 U.S. at 248-49, 106 S. Ct. at 2510; Matsushita Elec. Indus. Co.,

475 U.S. at 587, 106 S. Ct. at 1356.

Since it is rare to find direct proof of a discriminatory reason for an employee's

termination, the depositions, affidavits, and materials before the court must be carefully

scrutinized for circumstantial evidence that could support an inference of discrimination.

Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 37 (2d Cir. 1994).

### B.  ADEA and NYSHRL Claims[4]

The ADEA's purpose is "to promote employment of older persons based on their

ability rather than age; to prohibit arbitrary age discrimination in employment; [and] to help

employers and workers find ways of meeting problems arising from the impact of age on

employment."  29 U.S.C. § 621(b).  The prohibitions provided in the statute apply to protect

individuals of at least forty years of age.  See 29 U.S.C § 631(a), (b).  Under the ADEA, it is

unlawful to "discharge any individual or otherwise discriminate against any individual with

respect to his compensation, terms, conditions, or privileges of employment, because of such

individual's age."  29 U.S.C. § 623(a).  Of course, it is not unlawful to discharge or discipline

an employee for good cause.  See 29 U.S.C. § 623(f).

ADEA claims are properly analyzed under the familiar burden-shifting standard

applicable to Title VII employment discrimination claims first articulated by the Supreme

---

[4] "Age claims brought pursuant to the [NYS]HRL are subject to the same analysis as claims under the ADEA."  Morris v. Charter One Bank, F.S.B., 275 F. Supp. 2d 249, 254 (N.D.N.Y. 2003) (citing Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 466 (2d Cir. 2001)).  Accordingly, the ensuing discussion addresses plaintiff's ADEA and [NYS]HRL claims.  "Where liability is found in one, liability should be found in the other."  Id.

Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04, 93 S. Ct. 1817, 1825

(1973).  Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir 1994).

> Under the McDonnell Douglas burden shifting framework, a plaintiff
> must first establish a prima facie case of age discrimination.  Once
> the plaintiff has made out a prima facie case, the employer is
> required to offer a legitimate, nondiscriminatory business rationale
> for its actions.  If the employer articulates such a reason, the
> presumption of age discrimination dissolves, and the burden shifts
> back to the plaintiff to prove that the employer's stated reasons are
> merely pretextual and that age discrimination was the true reason
> for the adverse employment action.

Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 466 (2d Cir. 2001).

"To establish a prima facie case of age discrimination, a plaintiff must show four

things: (1) he is a member of the protected class; (2) he is qualified for his position; (3)

he has suffered an adverse employment action; and (4) the circumstances surrounding

that action give rise to an inference of age discrimination."  Carlton v. Mystic Transp.

Inc., 202 F.3d 129, 135 (2d Cir. 2000).  At the prima facie stage, a plaintiff's burden of

proof is de minimis.  Chambers, 43 F.3d at 37.

A defendant's burden of proffering a legitimate, nondiscriminatory reason for a

plaintiff's termination "can involve no credibility assessment."  St. Mary's Honor Center

v. Hicks, 509 U.S. 502, 506, 113 S. Ct. 2742, 2744 (1993).  Accordingly, the "employer

need not persuade the court that it was motivated by the reason that it provides; rather,

it must simply articulate an explanation that, if true would connote lawful behavior."

Greenway v. Buffalo Hilton Hotel, 143 F.3d 47, 52 (2d Cir. 1998).  If the employer

articulates such a reason, the employee has the burden of proving age was the real

reason for the termination.  Schnabel v. Abramson, 232 F.3d 83, 87 (2d Cir. 2000).

A plaintiff can use direct, statistical evidence to show that age motivated their termination.  Or, a plaintiff can use circumstantial evidence to demonstrate that the employer's termination reasons are pretextual and that age motivated the plaintiff's termination.  <u>Schnabel</u>, 232 F.3d at 85-86; <u>Gallo</u>, 22 F.3d at 1224.  To demonstrate that the employer's termination reasons are pretexual and that age motivated the plaintiff's termination in the summary judgment context, a plaintiff must raise an "issue of material fact as to whether (1) the employer's asserted reason for discharge is false or unworthy of belief and (2) more likely than not the employee's age was the real reason for the discharge."  <u>St. Mary's Honor Ctr.</u>, 509 U.S. at 516, 113 S. Ct. at 2744; <u>Carlton</u>, 202 F.3d at 137 (inconsistencies in employment procedures raise genuine issues of fact); <u>Danzer v. Norden Sys.</u>, 151 F.3d 50, 56 (2d Cir. 1998) (age-based remarks coupled with other "indicia" of discrimination can support an inference of discriminatory intent and withstand summary judgment); <u>Greenway</u>, 143 F.3d at 51-52 (inconsistent application of disciplinary procedures raises issues of fact).  Moreover, the totality of evidence is carefully reviewed to determine whether it reasonably supports an inference of discrimination.  <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133,149, 120 S. Ct. 2097, 2109 (2000).

In this case, Champion concedes, for the purpose of this motion only, that Ireton-Hewitt can establish a prima facie case.

Furthermore, Champion has proffered a legitimate, nondiscriminatory reason for terminating plaintiff:  he deliberately circumvented and violated defendant's new revenue recognition accounting policy by executing a lease with Signature

Transportation.  Dismissing plaintiff for violating company policies is a legitimate, non-discriminatory reason, therefore defendant has met its burden.  See Roge v. NYP Holdings, Inc., 257 F.3d 164, 169 (2d Cir. 2001).

Champion argues that genuine issues of material fact as to whether its reasons for termination are pretextual and age motivated the dismissal have not been raised. Therefore, it claims the summary judgment motion on plaintiff's ADEA and NYSHRL § 290-301 causes of action should be granted.

Ireton-Hewitt first attempts to demonstrate pretext by attacking the validity Champion's nondiscriminatory reason for his dismissal.  Thereafter, he claims the totality of circumstantial evidence demonstrates discriminatory intent.  The circumstantial evidence includes ageist comments allegedly made by Koch immediately preceding his termination, evidence of disparate treatment, and the fact that a significantly younger individual replaced him.  These arguments will be addressed in turn.

### 1. Validity of the Stated Reasons for Dismissal

Ireton-Hewitt argues there is a question of fact with respect to the validity of Champion's termination reasons because Champion did not terminate similarly-situated employees at the Chandler and Ephrata plants.  It contends that a question of fact has not been raised because Titan Homes was not similarly situated to those plants.  Particularly, defendant asserts that the Ephrata and Chandler plants had long-standing shippers lots, whereas Titan Homes established a shippers lot for the sole purpose of circumventing the new revenue recognition accounting policy.

Titan Homes and the Ephrata plant had identical shipper leases.  The Ephrata plant sent Ireton-Hewitt a faxed copy of it's lease, which plaintiff duplicated and used at the request of Dunn.  Also, it is undisputed that Dunn developed and implemented the Ephrata plant's lease when he was the plant's General Manager fifteen years earlier. Through its lease, Titan Homes followed the accounting practices of these plants by recognizing revenue for homes retained on their shippers lot that were neither physically shipped nor accompanied by a completed Bill and Hold form.  However, Champion only terminated the employees at Titan Homes, not the respective employees at the Ephrata and Chandler plants.

Furthermore, the Chandler and Ephrata plants used shippers lots to circumvent Champion's old bill and hold policy.  Thus, there is a question of fact with respect to whether they maintained and used their shippers lots to circumvent the new Bill and Hold policy, and therefore whether Titan Homes and the Chandler and Ephrata plants used their shipper lots for identical purposes--to circumvent the new Bill and Hold form. Accordingly, a reasonable jury could conclude that the plants were similarly situated in all material respects and that Titan Homes' employees suffered disparate treatment because only they were terminated.  See Reeves, 530 U.S. at 149, 120 S. Ct. at 2109; Graham v. Long Island R.R., 230 F.3d 34, 39 (2d Cir. 2002); Carlton, 202 F.3d at 139; Greenway 143 F.3d at 52.

Consequently, Champion's summary judgment motion on plaintiff's ADEA and NYSHRL causes of action on the grounds that he did not demonstrate a genuine issue of material fact regarding the validity of the reason for termination, will be denied.

### 2. __Totality of Circumstantial Evidence__

Next, Ireton-Hewitt argues that the circumstantial evidence of Koch's alleged ageist statements immediately preceding his termination, the fact that a significantly younger individual replaced him, and the alleged disparate treatment raise genuine issues of material of fact as to whether age motivated his termination.  Champion contends that the totality of circumstantial evidence proffered by plaintiff does not raise an issue of material fact regarding whether plaintiff was terminated because of his age.

Again, pursuant to Dunn's recollection the conversation in which the allegedly ageist comments occurred, proceeded as follows:

Al Koch:        "Our management sure is old"

Jim Dunn:     "Thank god or I would be dead"

B.J. Williams: "Hell, Jack Hewitt is 67 years old, right Jim?"

Jim Dunn:      "That's correct but we have a plan in place that will work when Jack retires without the plant missing a beat"

Koch and Williams deny and/or do not recollect the conversation, whereas Dunn asserts its occurrence and alleges its substance.  Also, the record does not disclose the context of the conversation.  Thus, there is an issue of fact with respect to the context of the conversation and a credibility question, both of which are directly related to the presence of age-based animus and thus an inference of discrimination. See Danzer, 151 F.3d at 56.

Further, it is undisputed that a younger individual replaced Ireton-Hewitt pursuant to plaintiff's Succession Plan.  The Plan detailed which individuals would take

what positions, if and when the position became vacant.  Essentially, plaintiff picked the individual that replaced him after his termination.  However, there is an issue of fact with respect to whether Koch knew the age of the replacement before he terminated plaintiff.

Furthermore, as previously discussed, Ireton-Hewitt has demonstrated an issue of fact as to whether he suffered disparate treatment, in that Champion did not terminate similarly-situated employees at the Ephrata and Chandler plants.

Taken as a whole, the sequence of the circumstantial evidence in which Koch terminated Ireton-Hewitt after allegedly making ageist comments, replacing him with a younger employee, and allegedly subjecting him to disparate treatment, raises genuine issues of material fact regarding whether defendant terminated plaintiff because of his age.  See Reeves, 530 U.S. at 149, 120 S. Ct. at 2109; Danzer, 151 F.3d at 57; Greenway, 143 F.3d at 52; Gallo, 22 F.3d at 1224.

Therefore, Champion's motion for summary judgment on Ireton-Hewitt's ADEA and NYSHRL claims on the grounds that there is no question of fact with respect to whether defendant terminated plaintiff because of his age, will be denied.

## C. New York State Labor Law Claims

Ireton-Hewitt argues there is a question of fact with respect to whether Champion's nonpayment of his unused vacation pay and severance pay contravened New York State Labor Law § 193.  Plaintiff also argues that whether his bonus constituted earned wages and thus whether defendant's nonpayment of his bonus violated New York State Labor Law, is a question of fact.  Defendant contends first,

that plaintiff does not raise an issue of material fact with respect to whether its

nonpayment of vacation and severance pay violated § 193.[5]  Second, defendant

argues that plaintiff has failed to raise a question of fact with respect to whether his

bonus constituted earned wages and whether he satisfied the bonus eligibility

requirements.  Therefore, defendant argues that its motion for summary judgment on

plaintiff's New York State Labor Law causes of action should be granted.

### 1. Vacation and Severance Pay

Section 193 states, in pertinent part:

> 1.  No employer shall make any deductions from the wages
> of an employee, except deductions which:
>
> a.  are made in accordance with the provisions of any law
> or any rule or regulation issued by any governmental agency;
>
> b.  are expressly authorized in writing by the employee and
> are for the benefit of the employee; provided that such
> authorization is kept on file on the employer's premises.  Such
> authorized deductions shall be limited to payments for insurance
> premiums, pension or health and welfare benefits, contributions to
> charitable organizations, payment for United States bonds,
> payments for dues or assessments to a labor organization and
> similar payments for the benefit of the employee.

N.Y. Labor Law § 193(1) (McKinney 2002).

Thus, the purpose of § 193 is to prohibit employers from making unauthorized

deductions from wages and it "was intended to place the risk of loss for such things as

---

[5]  Furthermore, Champion argues that nonpayment of Ireton-Hewitt's vacation pay, severance pay, and bonus did not contravene New York State Labor Law § 191 and §198-c.  However, Ireton-Hewitt contends that his claim is brought under § 193, not § 191 and §198-c.  Therefore a discussion of § 191 and § 198-c is unnecessary.

damaged, spoiled merchandise, or lost profits on the employer rather than the employee." Hudacs v. Frito-Lay, 90 N.Y.2d 342, 344 (N.Y. Ct. App. 1997).

Champion did not make unauthorized deductions from Ireton-Hewitt's vacation or severance pay.  Rather, it never tendered payment of unused vacation pay and severance pay to plaintiff.  Since these activities do not fall within the realm of § 193, an issue of fact does not exist.

Therefore, Champion's summary judgment motion on Ireton-Hewitt New York State Labor Law cause of action for the nonpayment of his vacation and severance pay will be granted.

### 2. Bonus Payment

Champion argues that Ireton-Hewit's bonus does not constitute a non-forfeitable earned wage within the statutory definition of "wages" of Article 6 of the New York State Labor Law, and therefore its bonus plan controls his bonus eligibility. Accordingly, it claims plaintiff does not satisfy the bonus plan eligibility requirements.

An "employee's entitlement to a bonus is governed by the terms of the employer's bonus plan." Hall v. U.P.S., 76 N.Y.2d 27, 36 (N.Y. Ct. App. 1990). However, this rule is limited by the "long standing policy against the forfeiture of earned wages." Weiner v. Diebold Group, Inc., 173 A.D.2d 166, 167 (N.Y. App. Div. 1st Dep't 1991).  "Thus, if the incentive [bonus] compensation payments were payments of earned wages, a plaintiff could not contract to forfeit them." Id.

Labor Law § 190(1) defines wages as "the earnings of an employee for labor or services rendered, regardless of whether the amount of earnings is determined on a

time, piece, commission or other basis." N.Y. Labor Law § 190(1) (McKinney 2002).

However, the statutory definition of wages "excludes certain forms of 'incentive

compensation' that are more in the nature of a profit-sharing arrangement and are both

contingent and dependent, at least in part, on the financial success of the business

enterprise." Truelove v. Northeast Capital, 95 N.Y.2d 220, 223-24 (N.Y. Ct. App.

2000). Further, when a bonus plan does "not predicate bonus payments upon a

plaintiff's own personal productivity nor give a plaintiff a contractual right to bonus

payments based on his productivity . . . the plaintiff's bonus payment is out of the

statutory definition of wages," and an employee's eligibility for bonus payments is

governed by the terms of the employer's bonus plans. Truelove, 95 N.Y.2d at 224;

Hall, 76 N.Y.2d at 36.

Ireton-Hewitt's bonus entitlement is governed by Champion's bonus plan unless

he shows that his bonus constituted earned wages. See Weiner, 173 A.D.2d at 167.

Champion's bonus policy reflected a combination of Ireton-Hewitt's and

Champion's performance. Specifically, the bonus program for calendar year 2003 had

four components, (1) Earnings Before Interest and Taxes; (2) Cash Management; (3)

Customer Satisfaction; and (4) Profit Improvement. Thus, the bonus program is more

in the nature of a profit-sharing arrangement and contingent and dependent, at least in

part, on the financial success of the company. See Truelove, 95 N.Y.2d at 224. Also,

the bonus plan did not predicate bonus payments on plaintiff's personal productivity,

nor did it give him a contractual right to bonus payments based on his productivity.

See id. Therefore, the undisputed facts demonstrate that plaintiff's bonus did not

satisfy the statutory definition of earned wages under Article 6 of New York Labor Law.
See id; N.Y. Labor Law § 190(1).  Consequently, plaintiff's bonus eligibility is governed
by the terms of defendants's bonus plan.  See Hall, 76 N.Y.2d at 36.

The Employee Handbook, of which Ireton-Hewitt concedes he had knowledge,
states that "any violation of company policies or directions, or termination of
employment, may result in loss of all or a portion of the bonus."  (Def. SOF ¶ 100.)
Furthermore, the Bonus Plan states, "the employee must hold the position at fiscal
year end 2003 [January 3, 2004] and be on the active payroll at the time the bonuses
are actually paid," to be eligible to receive a bonus.  Id.

Champion terminated Ireton-Hewitt on February 12, 2004.  It paid the bonuses
on February 27, 2004.  Thus, even though plaintiff held his position as of fiscal year
end, he was not on the active payroll at the time defendant paid the bonus.  Therefore,
plaintiff does not satisfy the bonus plan eligibility requirements.

Therefore, Champion's summary judgment motion on Ireton-Hewitt's cause of
action for nonpayment of his bonus will be granted.

## D. **Breach of Contract**

Champion argues that there is no question of fact regarding whether an
employment contract existed and whether it had a legal obligation to make bonus,
vacation, and severance payments under its corporate policies, and therefore it is
entitled to summary judgment dismissing Ireton-Hewitt's breach of contract causes of
action.

To recover damages for breach of contract, the complaint must set forth "the terms of the agreement upon which liability is predicated, either by express reference or by attaching a copy of the contract, and allege the special damages sustained." Chrysler Capital Corp., v. Hilltop Egg Farms, Inc., 129 A.D.2d 927, 928 (N.Y. App. Div. 3d Dep't 1987).  Any contract for an indefinite period of time is terminable at the will of either party at any time.  Edwards v. Citibank, 100 Misc. 2d 59, 60  (N.Y. Sup. Ct 1979).  A contract will not be found where mutuality is lacking.  Id.

However, notwithstanding the indefinite terms, an action to recover damages for the breach of an employment contract may be maintained where:

> [T]he existence of a limitation by express agreement is demonstrated by such circumstances as (1) the employee was induced to leave his prior employment by assurance that his new employer would not discharge him without cause, (2) that assurance is incorporated into the employment applications, and (3) the employment is subject to the provision of a personnel handbook or manual which provides that dismissal will be for just and sufficient causes only.

Diskin v. Consol. Edison Co. of N.Y., 135 A.D.2d 775, 777 (N.Y. App. Div. 2d Dep't 1987).

Champion outlined its vacation, severance, and bonus policies in personnel handbooks and manuals.  Thus, Ireton-Hewitt's breach of contract claims must be analyzed in turn, by the terms of the respective policies.  See id.

The vacation pay policy states, "[s]hould the employee terminate voluntarily or involuntarily, the employee will relinquish any unused vacation pay or any portion thereof."  (Def. SOF ¶ 104.)

Ireton-Hewitt concedes he was aware of this policy, and that this policy constituted the only promise defendant made with respect to vacation pay. It is, of course, undisputed that defendant terminated plaintiff. Therefore, plaintiff cannot satisfy the vacation eligibility requirements, so defendant did not breach its vacation pay policy.

The severance policy provides that only employees who are terminated involuntarily and not for cause will be offered severance pay. Again, Ireton-Hewitt concedes that the severance policy constituted all of the promises made to him regarding severance payments. He undisputedly satisfies the first element because he was involuntarily terminated. As discussed in the ADEA analysis, there is a question of fact as to whether defendant's reasons for termination were pretextual. Thus, a reasonable jury could or could not conclude that defendant terminated plaintiff for cause. Consequently, there is an issue of fact with respect to whether plaintiff was terminated for cause, and thus whether defendant breached its severance pay policy.

Champion placed its bonus plan in a personnel handbook. Specifically, the bonus plan, of which Ireton-Hewitt again concedes he had knowledge, states, "the employee must hold the position at fiscal year end 2003 and be on the active payroll at the time the bonuses are actually paid," to be eligible to receive a bonus. Id. at ¶ 98.

It is undisputed that Ireton-Hewitt held his position at fiscal year end 2003. His termination occurred on February 12, 2004. Thus, he was not on the active payroll when Champion paid the bonuses on February 27, 2004. Therefore, plaintiff did not

satisfy the bonus policy eligibility requirements, and defendant did not breach its bonus policy.

In sum, since Champion did not breach its vacation policy or its bonus policy, its motion for summary judgment on those causes of action shall be granted.  Because Ireton-Hewitt has raised a question of fact regarding whether the severance pay policy was breached, the motion for summary judgment on that cause of action will be denied.

## IV. CONCLUSION

Ireton-Hewitt has raised an issue of fact as to whether Champion's termination reasons were pretextual and age was the true motivator.  Furthermore, the facts within the record demonstrate that plaintiff is not permitted recourse through New York State Labor Law § 193 for defendant's nonpayment of wages and benefits.  Plaintiff has also raised an issue of fact as to whether defendant breached its obligation under its policies to tender severance pay; but failed to do so with respect to its obligations under the bonus and vacation policies.

Accordingly, it is

ORDERED that

1.  Defendant Champion Home Builders Co.'s motion for summary judgment is GRANTED in part and DENIED in part;

2.  The New York State Labor Law §§ 190-199 causes of action are DISMISSED;

3.  The breach of contract causes of action regarding vacation pay and bonus are DISMISSED; and

4.  The motion is DENIED in all other respects.

IT IS SO ORDERED.

_____
United States District Judge

Dated:  July 31, 2007
        Utica, New York